**KALIELGOLD PLLC**
Sophia G. Gold (SBN: 307971)
sgold@kalielgold.com
490 43rd Street, Suite 122
Oakland, CA 94609
Telephone: (202) 350-4783

**KALIELGOLD PLLC**
Jeffrey D. Kaliel (SBN 238293)
1100 15th Street NW, 4th Floor
Washington, DC 20005
Telephone: (202) 280-4783
jkaliel@kalielpllc.com

*Attorneys for Plaintiffs and the Putative Class*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

SANDRA SUMMERIL, LYNETTE HUBERT, DANIELLE IVORY, and EBONY BAKER, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

GIVEBUTTER, INC.,

Defendant.

Case No: 3:26-cv-04455-LL-VET

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Judge: Hon. Linda Lopez

Plaintiffs Sandra Summeril, Lynette Hubert, Danielle Ivory, and Ebony Baker (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege against Defendant Givebutter, Inc. ("Givebutter" or "Defendant") as follows:

## NATURE OF THE ACTION

1. Americans are a generous people, giving billions each year to charitable causes they support. In recent years, for-profit software companies like Givebutter have identified a business opportunity in all this generosity: acting as a middleman between donors and charitable organizations—but furtively charging excessive and undisclosed fees on charitable donations.

2. The opportunity to collect small add-on fees from every small donation a charity gets is massively profitable; as one indication, Givebutter recently received a $50 million private equity investment to expand its business. *See* Max Friedman, *A $50M investment in the future of Givebutter*, Givebutter (Apr. 22, 2024), https://givebutter.com/blog/givebutter-receives-50m-investment.

3. While Plaintiffs and other reasonable consumers are generous, they have no interest in or intention of enriching a private company like Givebutter as part of their charitable donations. But, unwittingly, and because of Givebutter's website design tricks and other deceptions, that is exactly what occurs.

4. This action is brought to protect donors who gave money in good faith to support causes they care deeply about, only to have additional funds diverted to Givebutter through a deceptive website interface design in which Givebutter automatically adds "Tips" and "processing fees" to donations without affirmative consumer assent.

5. Indeed, each time a customer makes an online donation through its website, Givebutter applies *two separate negative options*, automatically adding on supposedly optional fees to charitable donations and thus jacking up the cost of each charitable contribution. Non-conspicuous negative options are *per se* deceptive according to the Federal Trade Commission.

6. Givebutter's negative options are deceptive, as they are designed to be hard for consumers to find and remove.

7. Moreover, Givebutter's add-on fees and "Tips" are deceptively misdescribed and their disclosure is delayed until very late in the checkout process for charitable donations.

8. In sum, Givebutter employs dark patterns—including preselected, automatically added "Tip" and "processing fee" amounts, misleading interface design, and deceptively named and described add-on fees—to extract additional money from donors who believe they are donating only to the intended charitable recipient.

9. Charitable donations are uniquely personal and trust-based transactions. Donors act quickly, often emotionally, and with the reasonable expectation that their money will go where they intend—toward helping others, not toward undisclosed or preselected middleman fees like those charged by Givebutter.

10. As a result of Givebutter's practices, Plaintiffs and Class members paid money they did not knowingly authorize, conferring an improper financial benefit on Givebutter.

11. This case seeks to restore donor choice, ensure honesty and a free and fair market for charitable transactions, and to prevent platforms like Givebutter from quietly profiting from Americans' generosity through design practices that foist additional costs on consumers.

12. Plaintiffs seek restitution, injunctive relief, and all other available remedies to stop Givebutter's deceptive conduct and return ill-gotten gains.

## PARTIES

13. Plaintiff Summeril is a resident and citizen of Carlsbad, California.

14. Plaintiff Hubert is a resident and citizen of Albany, Oregon.

15. Plaintiff Ivory is a resident and citizen of West Chester, Ohio.

16. Plaintiff Baker is a resident and citizen of Snellville, Georgia.

17. Defendant is a Delaware corporation with its principal place of business in Wilmington, Delaware. Defendant operates an online fundraising and donation platform used nationwide. Defendant's platform processes donations and derives revenue from "Tips" added to those donations.

## JURISDICTION AND VENUE

18. This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. § 1332(d), this Court has original jurisdiction because:

a. the proposed Class is comprised of at least 100 members, § 1332(d)(5)(B);

b. at least one member of the proposed class is a citizen of a State other than Delaware, § 1332(d)(2)(A); and

c. the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, § 1332(d)(2), (6).

19. Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### I. Givebutter's Business Model

20. Givebutter advertises to charities that it offers "free fundraising at your fingertips."

21. Charities who choose to sign up with Givebutter are provided website integration features, whereby any consumer hoping to make an online donation to a charity is directed to a Givebutter widget to do so.

22. For example, Givebutter's donation form is a widget that charitable organizations can implement directly on the organization's own website:




23. Givebutter also offers nonprofit organization fundraising pages, fundraising event payment processing, and auction payment processing.

24. However, consumers who attempt to make a charitable donation online with a charity that uses Givebutter's services are provided no notice that, when they do so, they are actually being directed to a widget or website controlled or designed by a third party—namely, Givebutter.

25. Givebutter tells nonprofits that "[m]ost donors choose to cover" the processing fees Givebutter charges for its services when the donors are asked whether they wish to do so at the point of sale, "which means the average Givebutter campaign keeps nearly all funds raised."



26. But Givebutter neglects to inform these nonprofits that the reason "most donors" cover these processing fees is because those donors are never given any reasonable choice whether to pay the fees or not, as described herein, rendering the fees not actually "optional."

27. Givebutter also acts as the "payment processor" for charitable organizations, providing options by which donors may pay and providing options for nonprofits to withdraw funds. *See Nonprofit payment processing*, Givebutter, https://givebutter.com/nonprofit-payment-processing (last accessed November 11, 2026).

## II. <u>Givebutter's Deceptive Screen Flow Features Two Separate Negative Options.</u>

28. Once directed to a Givebutter designed and controlled widget or website, consumers attempting to make a charitable donation are immediately exposed to a series of dark patterns, deceptive design features, and outright misrepresentations—all designed to extract extra money out of unwitting donors.

29. During the donation checkout process, Givebutter automatically selects or adds a "processing fee" to each donation.

30. As shown below, the automatically added processing fee is designed to be easy for donors to overlook, and Givebutter then forces consumers to hunt around for a way to remove the fee—then obscures the method for removing such a fee.

31. Givebutter does the same thing with what it calls "Tips," automatically adding this additional fee to each donation in small font, and again forcing consumers to hunt around for a way to remove the "Tip" from their transaction—then obscuring the method for removing it.

32. At no point does Givebutter require donors to affirmatively opt in to "tipping" or paying processing fees through an unchecked box or the ability to provide express consent. It instead foists these fees on consumers without giving them the ability to provide affirmative assent.

33. By automatically adding these fees, then forcing consumers to hunt around for obscure ways to remove them, Givebutter ensures that donors are deceived into believing these additional charges are mandatory—or even part of the donation itself.

34. On information and belief, Givebutter designs the interface presented by charities to donors regarding the Tips and processing fees, including the name of the fees, the time at which the fees are first mentioned during the checkout process, the time at which the fee amounts are added to the price total, and the pre-selection of the checkbox or toggle button presented during the online checkout process. On information and belief, Givebutter also uses sales tactics that pressure charities into pre-selecting checkboxes or toggles at checkout that automatically add Tips and processing fees by default.

35. Even worse, on information and belief, Givebutter also requires nonprofits to keep the "Tips" option on its widget toggled on by default to use Givebutter's platform free of charge. On information and belief, Givebutter is aware that, by programming its widget to automatically opt in donors to its Tips and processing fees and other similar fees, most donors will unknowingly pay these fees. Givebutter does this for a simple reason: it knows that if its widgets were programmed to offer truly *optional* fees (requiring an opt-in from donors), the donors would not choose to pay these fees and enrich a private, for-profit company.

36. Here is how Givebutter's deception works, taking an example from online donations made to charitable organization "Ann's Heart." (Ann's Heart is a meaningful organization that works to provide emergency shelter, support basic needs, address food insecurity, and empower and educate residents of Phoenixville, Pennsylvania.)

37. When a donor initiates an online donation to "Ann's Heart," they are asked to select a donation amount which excludes the fees Givebutter will eventually add later in the checkout process:




38. After selecting the donation amount, the donor is asked if they want to make a monthly recurring donation instead:




39. After the donor decides whether they want to stick with the single contribution or make a monthly contribution, the donor is confronted with the checkout screen, which is riddled with deception.

40. First, in tiny font, the checkout screen automatically adds a so-called "processing fee" to all donations:




41. In truth, the "processing fee" is optional, *but Givebutter never once informs consumers of this fact.*

42. In other words, having automatically opted consumers into the supposedly optional processing fee, Givebutter then proceeds to obscure the fact that the fee is optional—nowhere providing on the checkout screen a disclosure that the fee is optional or an indication that the fee can be removed.

43. Indeed, any ability to *remove* the "processing fee" is hidden. A consumer would have to click on the inconspicuous word "edit," read through a deceptive disclaimer, then un-select a checkbox to remove the supposedly optional processing fee:



44. Even the description of the processing fee, itself hidden, is deceptive, stating: "[p]ayment processors take a cut of each transaction. With Givebutter, you have the option to cover these fees so 100% of your gift can go to the cause you care about." But Givebutter IS the payment processor. In fact, that is precisely what it tells charities when marketing its services to them:




45. Why go to all this trouble to add a processing fee on donations, rather than just asking donors to cover purported processing costs? Clearly, this process is designed to ensure consumers pay a fee they would not otherwise pay—and to ensure consumers do not and cannot remove the processing fee.

46. On the same checkout page, far to the right and in much smaller, lighter font than the prominently displayed amount of the donation itself, Givebutter automatically adds a "Tip" for itself.

47. In tiny font, Givebutter states that a Tip is optional, but there is no indication the Tip is actually added to the donation *automatically* and will become part of the total paid to Givebutter without further action from the consumer.

48. In other words, having automatically opted consumers into the supposedly optional Tip, Givebutter then proceeds to obscure the fact that the fee must be affirmatively

removed to be avoided—nowhere providing on the checkout screen a disclosure that the Tip is optional or an indication that the fee must be removed.

49. Indeed, any ability to *remove* the "Tip" is hidden. A consumer wishing to do so would have to figure out that the tiny, grey, downward-pointing triangle near the automatically added "Tip" can change the "Tip" amount, then repeatedly click that tiny triangle to manually set the value to zero.

50. Due to the small font and the unexpected nature of the automatically added fee, most consumers do not even notice the added Tip. And the consumers that do notice the added Tip are misled by the description. Givebutter describes the Tip as "[a]n optional tip [that] allows Ann's Heart to use Givebutter's 100% free fundraising platform and keeps it running for all nonprofits." But this is simply not true for two reasons.

51. First, on information and belief, the Tip for Givebutter is pure profit entirely untethered to the ability to collect donations.

52. Second, the Tip is redundant even by Givebutter's own deceptive description: it purportedly serves the same function as the also-automatically-added "processing fee": to cover the purported costs of processing charitable donations.

53. Givebutter's deceptive conduct does not consist of mere silence. Givebutter affirmatively speaks about the very charges at issue: it describes its "processing fee" to consumers as a cut taken by "[p]ayment processors," characterizes its Tip as "optional," and purports to explain the charges through checkout text. Having chosen to speak about its Tips and processing fees, Givebutter assumed a duty to speak fully, accurately, and without creating a false impression with consumers.

54. Givebutter likewise engaged in active concealment, not passive nondisclosure: it designed its checkout interface to hide the existence, nature, and removability of its charges—placing them in minimized text; delaying their appearance until late in the checkout flow; burying the removal mechanism; and requiring consumers to navigate deliberately obscured steps to decline charges they never elected. Acts

undertaken to prevent a consumer from discovering material facts are deceptive conduct regardless of any independent duty to speak.

## III. Negative Options are Per Se Deceptive.

55. Defendant's "Tips" and "processing fees" are precisely the type of "Junk Fees" that have come under government scrutiny in recent years:

> Junk fees are fees that are mandatory but not transparently disclosed to consumers. Consumers are lured in with the promise of a low price, but when they get to the register, they discover that price was never really available. Junk fees harm consumers and actively undermine competition by making it impractical for consumers to compare prices, a linchpin of our economic system.

The White House, The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition, Mar. 5, 2024, available at https://bidenwhitehouse.archives.gov/cea/written-materials/2024/03/05/the-price-isnt-right-how-junk-fees-cost-consumers-and-undermine-competition/ (footnotes omitted).

56. As the FTC said recently in its effort to combat Junk Fees:

> Many consumers said that sellers often do not advertise the total amount they will have to pay, and disclose fees only after they are well into completing the transaction. They also said that sellers often misrepresent or do not adequately disclose the nature or purpose of certain fees, leaving consumers wondering what they are paying for or if they are getting anything at all for the fee charged.

Federal Trade Commission, FTC Proposes Rule to Ban Junk Fees – Proposed rule would prohibit hidden and falsely advertised fees, Oct. 11, 2023, available at https://www.ftc.gov/news-events/news/press-releases/2023/10/ftc-proposes-rule-ban-junk-fees.

57. In its 2013 publication ".com Disclosures: How to Make Effective Disclosures in Digital Advertising," the FTC makes clear that when advertising and selling are combined on a website, and the consumer will be completing the transaction online, the disclosures should be provided before the consumer makes the decision to buy—for

example, before the consumer "add[s] to shopping cart." Fed. Trade Comm'n, *.com Disclosures: How to Make Effective Disclosures in Digital Advertising* at ii, 14, Mar. 2013, available at https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-revises-online-advertising-disclosure-guidelines/130312dotcomdisclosures.pdf.

58. As the FTC notes, "[f]or years, unscrupulous direct-mail and brick-and-mortar retailers have used design tricks and psychological tactics such as pre-checked boxes, hard-to-find-and read disclosures, and confusing cancellation policies, to get consumers to give up their money or data." Fed. Trade Comm'n, *FTC Report Shows Rise in Sophisticated Dark Patterns Designed to Trick and Trap Consumers*, Sept. 15, 2022, available at https://www.ftc.gov/news-events/news/press-releases/2022/09/ftc-report-shows-rise-sophisticated-dark-patterns-designed-trick-trap-consumers.

59. The FTC further notes in its *Enforcement Policy Statement Regarding Negative Option Marketing* that **"[a] 'pre-checked box' does not constitute affirmative consent."** https://www.ftc.gov/system/files/documents/public_statements/1598063/negative_option_policy_statement-10-22-2021-tobureau.pdf at p. 13 n.46 (emphasis added). Similarly, an item automatically added to the cart, without having done anything whatsoever to add that item, does not constitute affirmative consent.

60. The FTC has increasingly filed enforcement actions against merchants employing negative options, such as Hopper, a travel booking service whose use of hidden, preselected fees recently resulted in a $35 million settlement and injunctive relief requiring Hopper to clearly and conspicuously disclose all fees charged. *Travel App Paying $35,000,000 in Settlement Over Alleged Hidden Fees*, The Daily Hodl (July 15, 2026), available at https://dailyhodl.com/2026/07/15/travel-app-paying-35000000-in-settlement-over-alleged-hidden-fees.

61. As one court recently observed, imposing a negative option on unsuspecting consumers like those who utilize Givebutter's widget is "no different than [] adding a pair of sunglasses to a customer's shopping cart during the checkout stage without the

customer's consent." *Harris v. LoveShackFancy, LLC*, 2026 WL 2085573, at *7 (S.D.N.Y. July 20, 2026). Indeed, at least four courts in just the last year have concluded that similar negative options were plausibly deceptive. *See id.*; *Cantore v. Route App, Inc.*, No. 25 C 4677, 2026 WL 1353815, at *1 (N.D. Ill. May 7, 2026) (finding that Route's "widget design and name may deceive a reasonable consumer" because the fee is "present[ed] ... as mandatory"); *Ramos v. EyeBuyDirect, Inc.*, No. 8:25-cv-00539-JVS-DFM, 2025 WL 2633103 (C.D. Cal. Aug. 27, 2025); *DeMarco v. DNVB, Inc.*, No. 1:25-CV-3076-GHW, 2026 WL 203742, at *1 (S.D.N.Y. Jan. 26, 2026).

62. Even simple negative options that do not employ the host of tricks used here by Givebutter have been found deceptive. *See, e.g.*, *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1073 (D. Minn. 2015), *as amended* (Apr. 15, 2015) (denying Symantec's summary judgment motion on plaintiffs' California consumer protection claims, finding a genuine issue of material fact regarding whether the automatic addition of download insurance to consumers' shopping carts was deceptive); *Consentino v. Bridgestone Retail Operations, LLC*, No. 0:24-CV-60703, 2024 WL 3983985, at *3 (S.D. Fla. Aug. 29, 2024) (citing cases where businesses automatically adding undisclosed "negative options" have been found sufficient to constitute a deceptive or unfair practice under the FDUTPA); *Seagull v. WinRed, Inc.*, No. X07HHDCV226154527S, 2023 WL 4322714, at *4 (Conn. Super. Ct. June 28, 2023) ("the option to use default, pre-checked recurring donation boxes may be inherently misleading").

63. At bottom, negative options are part of an "unfortunate trend in Internet scams" "which trick consumers into buying things they did not intend to buy." Consumer Protection and the Law, November 2024 Update, Dee Pridgen and Jolina C. Cuaresma § 13:14.

## IV. <u>Tips and Processing Fees are Misnamed, Misdescribed Junk Fees.</u>

64. Givebutter deceptively characterizes the processing fee and the Tip, as described above, and obscures the fact that consumers need to opt out of them to avoid them.

65. Givebutter delays any mention of the fees until after consumers have selected their donation amount.

66. The processing fees and Tips are pure profit for Givebutter and not at all related to the actual costs of processing charitable donation payments.

67. On information and belief, the cost for Givebutter to process payments is well below the amounts passed through to donors as processing fees, and Givebutter illegally pockets the difference as profit.

68. As for debit card payments, the fees that a servicer like Givebutter must pay to process debit card transactions average about $0.34 per transaction, according to the Federal Reserve. *See* Federal Reserve, *Average Debit Card Interchange Fee by Payment Card Network*, https://www.federalreserve.gov/paymentsystems/regii-average-interchange-fee.htm (last accessed November 11, 2026).

69. Merriam-Webster defines a tip as "a gift or a sum of money tendered for a service performed or anticipated." *See* https://www.merriam-webster.com/dictionary/tip (last accessed November 11, 2026). But, as described herein, donors, charitable as they might be, never intended to give third-party payment processors like Givebutter a "gift." Donors are never meaningfully informed that any money they are giving as a part of their donation actually goes to Givebutter.

70. Indeed, numerous complaints on the Better Business Bureau's website confirm that donors are duped into paying Givebutter fees that they did not want or need to pay and that consumers never even understood that their transaction on the charity's website had anything to do with Givebutter:[1]

> Bait and switch? I thought I was donating money to help veterans. But then on my credit card statement is a charge to some Givebutter website. I was never taken to a web page that said I was donating to this company. I never would have considered doing so if they had. The website I thought I was donating money to never stared that this would be taking place. They could

[1]https://www.bbb.org/us/tx/austin/profile/marketing-software/givebutter-inc-0825-1000210184/customer-reviews.

have created their own account with [] and stated that they would be running my donation through them. BAIT AND SWITCH.

I would have given ZERO IF I could. No transparency. There was a default 15% tip on my charitable contribution that was automatically added and had to be disputed since I didnt agree to tip anyone. They imply that the tip is going to the charity but it goes to the platform despite the fact that they claim they are providing their service to the charity without fee. Total SCAM! Consumer Fraud. Hurts consumers and legitimate charities. I will never make a donation on this platform! A fee should also not be a percentage of the donation. Can you imagine if a credit card tried this stunt.?

What an absolute scam. Hidden tip charge can catch even the most careful donator.

By default the 15% tip checkbox is selected, unless user explicitly deselects. Which means by default they hope to charge 15% of your total raised fund. I will notify the organizer to be aware of this issue.

I'd like to give a zero rating!! Give Butter should be ashamed. We are a non-profit and had our annual fundraiser. Loyal donors placed winning bids for a silent auction, entered zero for a tip, and were shocked to find large tips were charged by Good Butter. This is a shameful business practice, especially trying to take advantage of donors for a non-profit.

Paid money through Givebutter for a charity event and left the tip amount blank. After processing Givebutter added a [*REMOVED*] tip amount. Givebutter claims they don't require a tip for its use. I started researching Givebutter and have read many reviews that are bad. This business needs to be investigated considering being tied to fund raising.

71. Donors presented with Givebutter's widget are not engaging in arms-length commercial transactions. They are attempting to help friends, schools, families in crisis, medical emergencies, and charitable organizations.

72. Donations are often made under time pressure, emotional stress, or a sense of urgency such as responding to a personal story, emergency, auction event, or community appeal.

73. In this context, donors reasonably rely on Givebutter to present charges clearly and honestly, and to require explicit consent before diverting any portion of their donation away from the intended cause.

74. Givebutter's conduct also violates the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401–05 ("ROSCA"). Specifically, Givebutter used "negative option" sales "[that] took advantage of consumers' expectations." *Id.* § 8401(8). Moreover, Givebutter violated ROSCA by using a negative option feature that (1) did not provide text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; and (2) did not obtain the consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction. *Id.* §§ 8403(1), (2).

**V. <u>Plaintiff Summeril's Experience</u>**

75. On June 3, 2023, Plaintiff Summeril donated $10.00 to God Behind Bars.

76. However, due to Defendant's widget, her purchase also included a $0.61 processing fee and a $2.00 Tip charged by Givebutter that was automatically and surreptitiously added to her cart without her affirmative consent.

77. Plaintiff Summeril did not know the processing fee or Tip for Givebutter existed or that it could have been removed at the time of her purchase.

78. Plaintiff Summeril would not have chosen to pay Givebutter's processing fee or Tip if she had known it was optional.

**VI. <u>Plaintiff Hubert's Experience</u>**

79. On January 8, 2026, Plaintiff Hubert began submitting a recurring monthly donation to the Brian Grant Foundation in the amount of $25.00 per month.

80. However, due to Defendant's widget, her purchase also included a $1.31 processing fee charged by Givebutter that was automatically and surreptitiously added to her cart without her affirmative consent.

81. Plaintiff Hubert did not know the processing fee existed or that it could have been removed at the time of her purchase.

82. Plaintiff Hubert would not have chosen to pay Givebutter's processing fee if she had known it was optional.

## VII. Plaintiff Ivory's Experience

83. On December 19, 2023, Plaintiff Ivory donated $250.00 to BT R.I.S.E., Inc.

84. However, due to Defendant's widget, her purchase also included a $7.78 processing fee and a $37.50 Tip charged by Givebutter that was automatically and surreptitiously added to her cart without her affirmative consent.

85. Plaintiff Ivory did not know the processing fee or Tip for Givebutter existed or that it could have been removed at the time of her purchase.

86. Plaintiff Ivory would not have chosen to pay Givebutter's processing fee or Tip if she had known it was optional.

## VIII. Plaintiff Baker's Experience

87. On or about October 7, 2025, Plaintiff Baker enrolled in $5.00 monthly donations to HD Supply Charitable Fund, Inc.

88. However, due to Defendant's widget, each of her purchases also included a $0.46 processing fee and a $1.00 Tip charged by Givebutter that was automatically and surreptitiously added to her cart without her affirmative consent.

89. Plaintiff Baker did not know the processing fee or Tip for Givebutter existed or that it could have been removed at the time of her purchase.

90. Plaintiff Baker would not have chosen to pay Givebutter's processing fee or Tip if she had known it was optional.

## IX. Plaintiffs Face a Real and Immediate Risk of Future Injury.

91. Each Plaintiff supports charitable causes and intends to continue making online donations to charitable organizations in the future, including to organizations that use Givebutter's donation forms, fundraising pages, and event and auction payment processing. Each Plaintiff would like to be able to donate through Givebutter-powered forms in the future without paying charges she did not knowingly authorize.

92. Plaintiffs cannot avoid Givebutter by choosing where to donate. As alleged above, Givebutter's widget is embedded directly on charities' own websites, and donors are provided no notice that they are interacting with a checkout flow that Givebutter

designs and controls. Plaintiffs therefore cannot know in advance whether a given charity's online donation form is operated by Givebutter, and they are likely to encounter Givebutter's checkout flow again when they donate online.

93. Givebutter continues to preselect and automatically add Tips and processing fees to donations, to describe its processing fee as a cut taken by "[p]ayment processors," and to obscure the means of removing these charges. Givebutter also controls—and can change at any time and without notice—the default amount and percentage of its Tips, the labels and descriptions attached to its charges, the point in the checkout flow at which they appear, and the means by which they may be removed. On information and belief, these settings and presentations vary from charity to charity and campaign to campaign.

94. As a result, Plaintiffs cannot rely on Givebutter's checkout presentation—including the total it presents as the donor's gift, its description of the processing fee, or its representation that a Tip is "optional"—to determine whether any given donation includes preselected charges payable to Givebutter, whether those charges reflect any actual processing cost, or how to remove them. Plaintiffs' general awareness that Givebutter has used such tactics in the past does not enable them to detect those tactics in future transactions: the charges are designed to evade notice, are presented differently on different charities' pages, and appear within an interface that does not disclose that Givebutter is involved at all. Plaintiffs thus face a real and immediate threat that they will again pay charges they did not knowingly authorize, or that they will forgo donating through Givebutter-powered forms altogether because they cannot trust Givebutter's checkout presentation. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969–70 (9th Cir. 2018).

95. Absent an injunction requiring Givebutter to obtain donors' affirmative consent before adding any Tip or processing fee, and to clearly and accurately disclose the nature, amount, recipient, and optional character of those charges before donors complete their transactions, Plaintiffs and Class members will continue to face this threat of future injury.

## X. Plaintiffs Lack an Adequate Remedy at Law.

96. Legal remedies available to Plaintiffs and Class members are inadequate because they are not as equally prompt and certain and in other ways as efficient as equitable relief. Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiffs and Class members fail to sufficiently adduce evidence to support an award of damages. Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money Defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize.

97. Legal claims for damages are also not equally certain as restitution because Plaintiffs' equitable claims entail fewer elements than their claims for damages. For example, the UCL imposes strict liability and requires no showing of Givebutter's intent or knowledge, whereas certain of Plaintiffs' damages claims require proof that Givebutter acted willfully, recklessly, or knowingly, or with intent that others rely on its misrepresentations and omissions. The UCL is also subject to a four-year limitations period, longer than the limitations periods governing certain of Plaintiffs' damages claims. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law. Due to these differences in proof and certainty, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law for damages. Even if legal remedies may be available, Plaintiffs seek equitable remedies in the alternative to legal ones, which are yet uncertain.

98. Legal remedies available to Plaintiffs and Class members are also inadequate because they do not address likely future harms. As of the date of this filing, Givebutter continues to preselect and automatically add Tips and processing fees to donations made through its checkout flow, to misdescribe those charges, and to obscure the means of

removing them. An award of damages for charges already paid would not stop Givebutter from imposing the same charges on Plaintiffs and Class members in future transactions. If Givebutter is not ordered to obtain donors' affirmative consent before adding Tips and processing fees and to accurately disclose the nature and recipient of those charges, Givebutter will continue to injure Plaintiffs and Class members through the misconduct alleged herein.

## XI. Tolling of the Statutes of Limitations.

99. Any applicable statutes of limitations have been tolled by the discovery rule, by Givebutter's fraudulent concealment, and by the doctrine of equitable estoppel. In addition, Plaintiffs' claims did not accrue until Plaintiffs discovered, or reasonably could have discovered, the facts giving rise to them.

100. Plaintiffs did not discover, and could not reasonably have discovered, that they had been injured by Givebutter's conduct until 2026, when each Plaintiff consulted with and retained counsel in connection with this matter. Before then, no Plaintiff knew, or had reason to suspect, that Givebutter had added preselected Tips or processing fees to her donation, that those charges were optional and removable, that they were retained by Givebutter rather than paid to a third-party payment processor, or that they bore no relationship to Givebutter's actual processing costs. Each Plaintiff learned these facts only through her consultation with counsel and counsel's investigation of how Givebutter's checkout flow operates.

101. Plaintiff Summeril's experience is illustrative. She made a single $10.00 donation to God Behind Bars on June 3, 2023. At the time, she did not know, and had no reason to suspect, that Givebutter had added a $0.61 processing fee and a $2.00 Tip to her donation, or that those charges were optional, removable, and payable to Givebutter. Plaintiff Summeril first learned these facts in 2026, when she consulted with and retained counsel in connection with this matter, and she did not and could not have learned them earlier for the reasons set forth below.

102. Plaintiffs' failure to discover their claims earlier was not the result of any lack of diligence. As alleged in detail above, Givebutter's checkout flow was designed specifically to prevent donors from noticing its Tips and processing fees, recognizing them as optional, or understanding that they were payable to Givebutter. The charges were preselected, presented in small and light font apart from the prominently displayed donation amount, and combined with each Plaintiff's donation into a single total that each Plaintiff reasonably understood to be her donation and its necessary incidents. The amounts were small relative to the donations and gave no indication that anything was amiss. And because Givebutter's widget appears on the charity's own website without notice that a third party is involved, Plaintiffs had no reason to know that a for-profit intermediary was involved in their donations at all.

103. Nor did anything after checkout put Plaintiffs on inquiry notice. A reasonable donor making a charitable gift has no reason to suspect that the platform processing the gift has diverted part of it to itself, and no reason to investigate the transaction after the fact. Plaintiffs did not suspect, and had no reason to suspect, any wrongdoing. Moreover, the facts necessary to understand Plaintiffs' claims—including Givebutter's design and control of the checkout interface, its default settings, the recipient of the charges, and the relationship between its processing fees and its actual costs—were within Givebutter's exclusive knowledge and control. Plaintiffs made no donations through Givebutter other than those alleged herein, and therefore had no later occasion to encounter Givebutter's checkout flow that could have alerted them to the charges.

104. Givebutter's fraudulent concealment independently tolled any applicable statutes of limitations. As alleged above, Givebutter did not merely remain silent. It affirmatively described its processing fee as a cut taken by "[p]ayment processors" when Givebutter is itself the payment processor, labeled its Tip "optional" while preselecting it, and actively concealed the existence, nature, recipient, and removability of its charges through the design of its checkout interface. Givebutter took these steps knowing their effect—it touts to nonprofits that "[m]ost donors choose to cover fees"—and for the

purpose of preventing donors from noticing and declining its charges. Plaintiffs reasonably relied on Givebutter's checkout presentation and, as a result, did not discover the facts giving rise to their claims despite exercising reasonable diligence.

105. For the same reasons, Givebutter is estopped from relying on any statute of limitations defense. Having chosen to speak about its Tips and processing fees, Givebutter was obligated to disclose their true nature fully and accurately, and it instead knowingly concealed that information from Plaintiffs and Class members.

106. Under Delaware law, which governs Count I, the limitations period is likewise tolled where, as here, the injury was inherently unknowable and the plaintiff was blamelessly ignorant of the wrongful act and resulting injury, and where the defendant fraudulently concealed the facts giving rise to the claim.

107. Additionally, each Tip and processing fee Givebutter imposes is a separate wrong that gives rise to a new claim with its own limitations period. Givebutter's practices are ongoing, and claims arising from charges imposed within the applicable limitations periods are timely regardless of when Givebutter first began engaging in those practices.

## CLASS ACTION ALLEGATIONS

108. Plaintiff Summeril brings this action individually and as a representative of all those similarly situated and the members of the following class:

> All persons who, while residing in the State of California, and within the applicable statute of limitations, paid Givebutter a preselected Tip or processing fee (the "California Class").

109. Plaintiff Hubert brings this action individually and as a representative of all those similarly situated and the members of the following class:

> All persons who, while residing in the State of Oregon, and within the applicable statute of limitations, paid Givebutter a preselected Tip or processing fee (the "Oregon Class").

110. Plaintiff Baker brings this action individually and as a representative of all those similarly situated and the members of the following class:

> All persons who, while residing in the State of Georgia, and within the applicable statute of limitations, paid Givebutter a preselected Tip or processing fee (the "Georgia Class").

111. Unless otherwise noted herein, the California Class, Oregon Class, and Georgia Class are collectively referred to as the "Class."

112. Plaintiff Ivory brings her claims individually.

113. Excluded from the Class are Givebutter, its parents, subsidiaries, affiliates, officers and directors, any entity in which Givebutter has a controlling interest, all personal accountholders who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

114. Plaintiffs reserve the right to modify or amend class definitions, if necessary, before this Court determines whether class certification is appropriate.

115. The members of the Class are so numerous that joinder is impractical. The Class consists of at least thousands of members, the identity of whom is within the knowledge of, and can be ascertained only by resort to, Givebutter's records.

116. The claims of Plaintiffs are typical of the claims of the classes they seek to represent in that Plaintiffs, like all members of the Class, were charged improper and deceptive fees as alleged herein and were damaged by Givebutter's misconduct. Furthermore, the factual basis of Givebutter's misconduct is common to all members of the Class and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

117. There are numerous questions of law and fact common to the Class that predominate over any questions affecting only individual members of the Class. Those questions include, but are not limited to, the following:

a. Whether Givebutter's conduct misled or had the tendency to mislead consumers;

b. Whether Givebutter engaged in unfair, unlawful, and/or fraudulent business practices under the laws asserted;

c. Whether Givebutter's conduct constitutes violations of the laws asserted;

d. Whether members of the Class were harmed by Givebutter's misrepresentations;

e. Whether Givebutter was unjustly enriched;

f. Whether Plaintiffs and the Class have been damaged, and if so, the proper measure of damages; and

g. Whether an injunction is necessary to prevent Givebutter from continuing to engage in the wrongful conduct described herein.

118. Plaintiffs' claims are typical of the claims of other members of the Class, in that they arise out of the same wrongful fee policies and practices. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other members of the Class.

119. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, consumer class actions involving the imposition of junk fees. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

120. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual member of the Class's claims is small relative to the complexity of the litigation, and due to the financial resources of Givebutter, no member of the Class could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Class will continue to suffer losses and Givebutter's misconduct will proceed without remedy.

121. Even if members of the Class themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent

or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

122. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its treatment as a class action.

123. Givebutter has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

124. All conditions precedent to bringing this action have been satisfied and/or waived.

**COUNT I**
**VIOLATIONS OF THE**
**DELAWARE CONSUMER FRAUD ACT**
**6 Del. C. §§ 2511, *et seq.***
**(On behalf of Plaintiffs and the Class)**

125. Plaintiffs incorporate the preceding allegations by reference as if fully set forth herein.

126. The purpose of the Delaware Consumer Fraud Act ("DCFA") is "to protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce in part or wholly within this State." 6 Del. C. § 2512. The DCFA is construed liberally to effectuate that remedial purpose.

127. Givebutter is, and at all relevant times was, a "person" within the meaning of 6 Del. C. § 2511, engaged in the conduct of trade and commerce in part or wholly within the State of Delaware.

128. Givebutter is incorporated in Delaware and maintains its principal place of business in Wilmington, Delaware. The unlawful practices alleged herein were conceived, designed, implemented, and directed from Delaware. On information and belief, Givebutter designed and controls its checkout interface from its Wilmington headquarters,

including the preselection and default enablement of its Tips and processing fees, the amounts of those charges, the timing and manner of their disclosure during checkout, the descriptions of those charges presented to consumers, and the concealment of the means of removing them. The challenged trade practices accordingly occurred "in part or wholly within" Delaware within the meaning of 6 Del. C. § 2512.

129. The payment-processing and fundraising-transaction services Givebutter sells, and the Tips and processing fees it charges for them, constitute "merchandise" within the meaning of 6 Del. C. § 2511, and Givebutter's imposition of those charges for consideration constitutes a "sale" within the meaning of the DCFA.

130. Section 2513(a) of the DCFA prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."

131. Givebutter violated 6 Del. C. § 2513(a) by: (1) automatically adding preselected Tips and processing fees to consumers' transactions without requesting or obtaining their affirmative consent; (2) labeling its Tip "optional" while simultaneously preselecting it, adding it to the transaction total by default, and obscuring the means of removing it; (3) presenting partial and misleading descriptions of its charges that create the false impression that the amounts charged constitute, or benefit, the consumer's chosen charitable cause; (4) misrepresenting its processing fees as legitimate pass-through costs when they bear no reasonable relationship to legitimate payment processing fees; and (5) designing its checkout interface—through inconspicuous placement, minimized font, delayed disclosure, and concealed removal mechanisms—to cause consumers to confuse Givebutter's add-on charges with their intended contributions. The concealed, suppressed, and omitted facts were material: a reasonable consumer making a charitable contribution

would attach importance to whether portions of the amount charged are optional add-on fees payable to a for-profit intermediary rather than to the consumer's chosen cause.

132. Givebutter acted with the intent that consumers rely upon its misrepresentations, concealments, suppressions, and omissions, as demonstrated by its deliberate use of preselected defaults, negative options, delayed and inconspicuous disclosures, and obscured removal mechanisms—design choices whose only purpose and effect is that consumers complete checkout without noticing or removing Givebutter's charges.

133. Under the DCFA, Plaintiffs and Class members need not prove that they were in fact misled, deceived, or damaged in reliance upon Givebutter's deceptive practices; the act, use, or employment of the deceptive practices in connection with the sale of merchandise is itself unlawful.

134. Givebutter's conduct as described herein is also deceptive under the DCFA insofar as Givebutter violates ROSCA by using "negative option" sales that took advantage of consumers' expectations, and by using a negative option feature that (1) did not provide text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; and (2) did not obtain the consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account. 15 U.S.C. §§ 8401(8), 8403(1), (2).

135. Plaintiffs and Class members justifiably relied upon Givebutter's deceptive, false and misleading representations concerning Tips and processing fees in making their decisions to donate to their charity of choice. Plaintiffs and Class members would not have paid Defendant's Tips and processing fees absent Defendant's misrepresentations and omissions, which include, but are not limited to, its deceptive interface design.

136. As a direct and proximate result of Givebutter's unlawful practices, Plaintiffs and Class members suffered ascertainable losses in the form of the Tips and processing fees charged to and collected from them.

137. Givebutter's violations of the DCFA were not isolated or inadvertent: they were effected through a checkout architecture deliberately engineered to extract concealed charges from consumers engaged in acts of charity—transactions in which consumers reposed particular trust and confidence in Givebutter to convey their funds to their chosen causes. Givebutter's conduct was accordingly gross, oppressive, and aggravated, and involved a breach of trust and confidence, warranting an award of punitive damages in addition to the compensatory damages to which Plaintiffs and Class members are entitled.

138. Plaintiffs and Class members are further entitled to recover compensatory damages, restitution of all Tips and processing fees collected through the unlawful practices, injunctive relief, and such other relief as the Court deems just and proper.

**COUNT II**
**VIOLATIONS OF THE**
**GEORGIA FAIR BUSINESS PRACTICES ACT**
**O.C.G.A. § 10-1-390, *et seq.***
**(On behalf of Plaintiff Baker and the Georgia Class)**

139. Plaintiff Baker incorporates the preceding allegations by reference as if fully set forth herein.

140. Givebutter is, and at all relevant times was, engaged in "trade" and "commerce" and in "consumer transactions" and "consumer acts or practices" within the meaning of the Georgia Fair Business Practices Act ("FBPA"), O.C.G.A. § 10-1-392, including through its provision of payment-processing services to donors, such as Plaintiff Baker, in exchange for Tips and processing fees.

141. O.C.G.A. § 10-1-393(a) declares unlawful "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce."

142. By: (1) automatically and surreptitiously adding Tips and processing fees to consumers' donations without affirmative consent; (2) misrepresenting the purpose of its Tips and processing fees as an extra donation to the charity of choice; and (3) violating ROSCA with negative option sales as alleged herein, Givebutter engaged in unfair and

deceptive acts and practices in violation of O.C.G.A. § 10-1-393(a), including by causing actual confusion or misunderstanding as to the source, sponsorship, and purpose of the Tips and processing fees, O.C.G.A. § 10-1-393(b)(2), and by representing that its services have benefits that they do not have, O.C.G.A. § 10-1-393(b)(5).

143. Plaintiff Baker and the Georgia Class justifiably relied upon Givebutter's intentionally deceptive, false, and misleading representations concerning Tips and processing fees in making their decisions to donate to their charities of choice. Plaintiff Baker and the Georgia Class would not have paid Givebutter's Tips and processing fees absent Givebutter's misrepresentations and omissions, including its deceptive interface design.

144. As a direct and proximate result of Givebutter's unfair and deceptive acts and practices, Plaintiff Baker and the Georgia Class have suffered injury and damages, including the loss of the Tips and processing fees charged to, and paid by, them without their knowledge or authorization.

145. Pursuant to O.C.G.A. § 10-1-399(d), Plaintiff Baker is entitled to an award of reasonable attorneys' fees and expenses of litigation incurred in connection with this action.

146. Pursuant to O.C.G.A. § 10-1-399(g), a copy of this First Amended Complaint will be served upon the Georgia Attorney General by certified or registered mail or statutory overnight delivery within 20 days of the filing of this First Amended Complaint.

## COUNT III
## VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")
## (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)
**(On behalf of Plaintiff Summeril and the California Class)**

147. Plaintiff Summeril incorporates the preceding allegations by reference as if fully set forth herein.

148. The UCL prohibits and provides civil remedies for unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in

commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

149. The UCL imposes strict liability. Plaintiff Summeril need not prove that Defendant intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—only that such practices occurred.

150. A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

151. A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the public.

152. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

153. Defendant committed unfair and fraudulent business acts and practices in violation of the UCL by: (1) automatically and surreptitiously adding Tips and processing fees to consumers' donations without affirmative consent; (2) misrepresenting the purpose of its Tips and processing fees as an extra donation to the charity of choice; and (3) violating ROSCA with negative option sales as alleged herein.

154. Defendant's acts and practices offend an established public policy of truthful advertising in the marketplace and constitute immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

155. The harm to Plaintiff Summeril and the California Class outweighs the utility of Defendant's practices. There were reasonably available alternatives to further Defendant's legitimate business interests other than the misleading and deceptive conduct alleged herein.

156. Defendant's conduct constitutes an "unlawful" act under the UCL because it violates sections of ROSCA and the other statutes asserted as causes of action herein.

157. Defendant's conduct constitutes an "unlawful" act under the UCL because it violates ROSCA by using "negative option" sales tactics "[that] took advantage of consumers' expectations" and by using a negative option feature that (1) did not provide text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; and (2) did not obtain the consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction. 15 U.S.C. §§ 8401(8), 8403(1), (2).

158. Defendant's business practices have misled Plaintiff Summeril and the California Class and, unless enjoined, will continue to mislead them in the future.

159. Plaintiff Summeril and the California Class justifiably relied upon Defendant's deceptive, false, and misleading representations in making their decisions to donate to their charity of choice. Plaintiff Summeril and the California Class would not have paid Defendant's Tips and processing fees absent Defendant's misrepresentations and omissions.

160. As a direct and proximate result of these unfair and deceptive practices, Plaintiff Summeril and the California Class have been injured and have suffered and will continue to suffer real damages. Defendant's fraudulent conduct is ongoing and presents a continuing threat to Plaintiff Summeril and the California Class that they will be deceived. Plaintiff Summeril and the California Class desire to conduct further business with Defendant but cannot rely on Defendant's representations unless an injunction is issued, for the reasons alleged in Section IX above.

161. As a result of its unfair, fraudulent, and unlawful conduct, Defendant has been unjustly enriched and should be required to disgorge its unjust profits and make restitution to Plaintiff Summeril and the California Class pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

162. Plaintiff Summeril and the California Class have no adequate remedy at law for the reasons alleged in Section X above, and in part because Defendant continues to

automatically add Tips and processing fees to all purchases. Plaintiff Summeril and the California Class therefore seek an injunction on behalf of the general public to prevent Defendant from continuing to engage in the deceptive and misleading practices alleged herein.

## COUNT IV
## VIOLATIONS OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT ("CLRA")
## (Cal. Civ. Code §§ 1750, *et seq.*)
## (On behalf of Plaintiff Summeril and the California Class)

163. Plaintiff Summeril incorporates the preceding allegations by reference as if fully set forth herein.

164. Plaintiff Summeril and California Class members are "consumers" as defined by California Civil Code § 1761(d).

165. By enabling donors to make donations to charitable organizations and other similar entities and to provide Defendant with "Tips," Defendant provided "services" within the meaning of California Civil Code § 1761(b).

166. Defendant's electronic processing of donations constituted "transactions" within the meaning of California Civil Code § 1761(e).

167. Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by California Civil Code § 1770(a) in transactions with Plaintiff Summeril and California Class which were intended to result in, and did result in, the sale of goods or services: "Representing that goods or services have . . . characteristics . . . that they do not have" (a)(5); "Advertising goods or services with intent not to sell them as advertised" (a)(9); and "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14).

168. Specifically, Defendant: (1) automatically and surreptitiously added Tips and processing fees to consumers' donations without affirmative consent; (2) misrepresented

the purpose of its Tips and processing fees as an extra donation to the charity of choice; and (3) violated ROSCA with negative option sales as alleged herein.

169. Pursuant to the CLRA, concurrently with the filing of this First Amended Complaint, counsel is notifying Defendant in writing by certified mail of the particular violations of the CLRA alleged herein and demanding that it rectify the problems alleged above and give notice to all affected consumers of Defendant's intent to act. If Defendant fails to respond to the letter or fails to agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice, Plaintiff Summeril will move to amend this First Amended Complaint to pursue claims for actual, punitive and statutory damages, as appropriate, against Defendant. As to this cause of action, at this time, she seeks only public injunctive relief.

170. At this time, Plaintiff Summeril, on behalf of herself and the California Class, seeks only injunctive relief under this Count, including public injunctive relief for the benefit of the general public, pursuant to Cal. Civ. Code § 1780(a)(2). Plaintiff Summeril does not seek actual, punitive, or statutory damages, restitution, or any other monetary relief under the CLRA. As alleged in Section IX above, Plaintiff Summeril faces a real and immediate threat of future injury from Defendant's ongoing practices, which an injunction would redress.

## COUNT V
## VIOLATIONS OF OREGON'S UNLAWFUL TRADE PRACTICES ACT ("UTPA") (ORS §§ 646.605, *et seq.*)
**(On behalf of Plaintiff Hubert and the Oregon Class)**

171. Plaintiff Hubert incorporates the preceding allegations by reference as if fully set forth herein.

172. Givebutter is, and at all relevant times was, a "person" as defined by the UTPA, and its conduct as alleged herein occurred in the course of its business, vocation, or occupation and in "trade" and "commerce" within the meaning of the UTPA including trade and commerce directly or indirectly affecting the people of the State of Oregon.

173. The donation-processing services that Givebutter provided to Plaintiff Hubert and the Oregon Class, including the imposition of Tips and processing fees in connection with their charitable donations, are “services” obtained primarily for personal, family, or household purposes within the meaning of the UTPA.

174. By: (1) automatically and surreptitiously adding Tips and processing fees to consumers’ donations without affirmative consent; (2) misrepresenting the purpose of its Tips and processing fees as an extra donation to the charity of choice; and (3) violating ROSCA with negative option sales as alleged herein, Givebutter engaged in unlawful trade practices in violation of ORS 646.608(1), including by representing that its services have sponsorship, approval, characteristics, uses, benefits, or qualities that they do not have, ORS 646.608(1)(e); and making false or misleading representations of fact concerning the offering price of, and Givebutter’s cost for, its services, ORS 646.608(1)(s).

175. Under ORS 646.608(2), a representation actionable under the UTPA “may be any manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact.” Givebutter’s unlawful representations as alleged herein include its failure to disclose, clearly and conspicuously or at all, that its Tips and processing fees are preselected and automatically added to each donation, and that they are retained by Givebutter—a private, for-profit company—rather than delivered to the donor’s charity of choice.

176. Specifically, Givebutter represented—by words and by conduct, including by presenting the checkout total as the amount of the donor’s gift—that the amount Plaintiff Hubert paid represented her donation to the Brian Grant Foundation and its necessary incidents, and that its processing fee covered a “cut” taken by “[p]ayment processors.” Those representations were false or misleading. The processing fee was an optional charge that Givebutter preselected on Plaintiff Hubert’s behalf and retained for itself, and, on information and belief, it substantially exceeded any actual cost to Givebutter of processing her donation. Givebutter thereby represented that its services had characteristics, benefits, and qualities that they did not have, in violation of ORS 646.608(1)(e), and made false or

misleading representations of fact concerning the offering price of, and Givebutter's cost for, its services, in violation of ORS 646.608(1)(s).

177. Givebutter's unlawful representations and omissions caused Plaintiff Hubert's ascertainable loss. Plaintiff Hubert reviewed the checkout screen Givebutter presented and authorized payment of the total amount shown in reliance on Givebutter's presentation of that total as her donation and its necessary incidents. Her lack of awareness that the processing fee was a separate, optional charge payable to Givebutter is the direct result of Givebutter's unlawful practices, not a break in causation. Had Givebutter disclosed, clearly and conspicuously on the checkout screen, that the processing fee was an optional charge preselected on her behalf, that it could be removed, and that it would be retained by Givebutter, Plaintiff Hubert would have seen that disclosure and declined the fee, and she would not have suffered the loss alleged herein.

178. Givebutter's use of the unlawful methods, acts, and practices alleged herein was willful within the meaning of ORS 646.605(10) because Givebutter knew or should have known that its conduct violated the UTPA.

179. Givebutter's use of these unlawful methods, acts, and practices was also reckless and knowing within the meaning of ORS 646.638(8). Givebutter did not stumble into its checkout design; it deliberately chose to preselect its Tips and processing fees, to delay and minimize their disclosure, and to obscure the means of removing them. On information and belief, Givebutter requires nonprofits to keep its Tip toggled on by default to use its platform free of charge, and it knows that, because of these defaults, most donors will unknowingly pay its charges. Givebutter's own marketing to nonprofits touts that "[m]ost donors choose to cover fees when asked," reflecting that Givebutter tracks, and knows, the rate at which donors pay these charges. Givebutter also knows that its processing fee is retained by Givebutter—which is itself the payment processor—notwithstanding its description of the fee as a cut taken by "[p]ayment processors." And Givebutter has been on notice of donor confusion through numerous public consumer complaints, including those quoted above, and through FTC guidance that a pre-checked

box does not constitute affirmative consent. Despite this knowledge, Givebutter has continued its practices, either knowing that they deceive donors or consciously disregarding a substantial and unjustifiable risk that they do so.

180. As a direct and proximate result of Givebutter's willful, unlawful trade practices, Plaintiff Hubert and the Oregon Class suffered an ascertainable loss of money or property in the amount of the Tips and processing fees that were charged to, and paid by, them without their knowledge or authorization.

181. Pursuant to ORS 646.638(1) and (8), Plaintiff Hubert and the Oregon Class are entitled to recover their actual damages or statutory damages of $200 per person, as provided by ORS 646.638, whichever is greater, together with punitive damages and such equitable relief, including an injunction prohibiting Givebutter's deceptive fee practices, as the Court considers necessary or proper. Plaintiff Hubert and the Oregon Class are also entitled to an award of reasonable attorneys' fees and costs pursuant to ORS 646.638(3).

182. Pursuant to ORS 646.638(2), a copy of this First Amended Complaint will be mailed to the Oregon Attorney General upon its filing, and a copy of any judgment entered in this action will be mailed to the Oregon Attorney General upon entry of judgment.

## COUNT VI
## UNJUST ENRICHMENT
**(On behalf of Plaintiffs and the Class, in the alternative)**

183. Plaintiffs incorporate the preceding allegations by reference as if fully set forth herein.

184. Plaintiffs plead this Count in the alternative to their statutory claims pursuant to Federal Rule of Civil Procedure 8(d), including in the event that any statutory claim asserted herein is held unavailable or otherwise fails, in which case Plaintiffs and Class members would lack an adequate remedy at law for Givebutter's retention of the challenged charges. To the extent California law applies, this Count states a quasi-contract claim seeking restitution. Each Plaintiff asserts this Count under the law of her state of

residence, and the elements of unjust enrichment do not materially differ among those states as applied to the conduct alleged herein.

185. By means of Defendant's wrongful conduct as alleged herein, Defendant knowingly assessed fees upon Plaintiffs and the Class that are unfair, unconscionable, and oppressive.

186. Defendant knowingly received and retained wrongful benefits and funds from Plaintiffs and the Class. In so doing, Defendant acted with conscious disregard for the rights of Plaintiffs and the Class.

187. As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and the Class.

188. Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

189. Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to retain the benefits it received, and is still receiving, without justification, from the imposition of processing fees and Tips on Plaintiffs and the Class in an unfair, unconscionable, and oppressive manner. Defendant's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

190. The financial benefits derived by Defendant rightfully belong to Plaintiffs and the Class. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Class all wrongful or inequitable proceeds collected by Defendant. A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendant traceable to Plaintiffs and the Class.

191. Plaintiffs and the Class have no adequate remedy at law for the reasons alleged in Section X above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class demand a jury trial on all claims so triable and judgment as follows:

a) Declaring Givebutter's policies and practices as described herein to be wrongful, unfair, and unconscionable;

b) An order enjoining Givebutter from continuing the unlawful and deceptive practices alleged herein, including public injunctive relief;

c) Restitution of all amounts paid to Givebutter by Plaintiffs and the Class as a result of the wrongs alleged herein in an amount to be determined at trial;

d) Disgorgement of the ill-gotten gains derived by Givebutter from its misconduct;

e) Actual damages in an amount according to proof;

f) Statutory damages as provided by law;

g) Punitive and exemplary damages;

h) Pre-judgment interest at the maximum rate permitted by applicable law;

i) Costs and disbursements assessed by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

j) Such other relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this First Amended Complaint that are so triable as a matter of right.

Dated: November 16, 2026 **KALIELGOLD PLLC**

By: */s/ Sophia G. Gold*
Jeffrey D. Kaliel
Sophia G. Gold

*Attorneys for Plaintiffs and the Putative Class*